## HERNDON v. MOORE.

1. The decision in *Davenport* v. *Caldwell*, 10 *S. C.* 317, that the legislature cannot confer upon Probate Courts jurisdiction in partition, affirmed.
2. Proceedings for partition regularly had in the Probate Court prior to November 27th, 1878, when the judgment in the case of *Davenport* v. *Caldwell* was filed, is binding upon all the parties concerned.

Per McGOWAN, A. J.—

3. The legislature has no power as *parens patriæ* to authorize the Probate judge to sell or partition the property of one not *sui juris*, especially where the property is owned in common with others.
4. The jurisdiction given by the constitution to Probate Courts "in all matters testamentary and of administration," does not include the right to make partition.
5. And "business appertaining to minors" in this grant of jurisdiction, means business peculiar to minors, and, therefore, does not include partition.
6. Adult parties to proceedings in partition in a court without jurisdiction, under which the lands are sold, and who receive the proceeds, are estopped from asserting title against the purchasers at such sale.
7. *Communis error facit jus* is a doctrine exceptional in character, but should be applied where the erroneous opinion has furnished the ground-work and substratum of practice, and has, to a large extent, affected the titles to land.

Before HUDSON, J., Union, March, 1881.

The facts of this case appear in the opinion. The Circuit decree, after a statement of these same facts, was as follows:

It seems to the court that the purchasers of these lands would have been proper parties to this cause, but as no objection has been taken by the pleadings to their non-joinder, I will consider the case as between the parties to the cause. The case discloses

an equity in the plaintiff, which entitles her, as against her co-distributees, to a part of the relief which she demands.

The Court of Probate established by the constitution of 1868 was designed to take the place of the Court of Ordinary, but with enlarged powers. From the fact that the Court of Ordinary exercised jurisdiction in cases of partition within certain limits, no question was made of the right and power of the legislature to confer jurisdiction upon Courts of Probate, in cases of partition. The legislature of the summer of 1868, in their act organizing the Courts of Probate, conferred upon such courts jurisdiction in all cases of partition. No question was made of the constitutionality of this act. Lawyers in all parts of the State acted under it, Courts of Probate exercised this jurisdiction unchallenged, and the Circuit Courts recognized it and adjudged questions arising from such proceedings. Lands sold under orders of the Courts of Probate, realized the same prices as when sold under judgments of the Circuit Courts. The Supreme Court of this State recognized this jurisdiction in the Courts of Probate, and adjudged without question rights which arose out of such sales.

In *McNamee* v. *Waterbury*, 4 *S. C.* 156, a case of November Term, 1872, the Supreme Court was called upon to determine whether the Courts of Probate of this State could order the sale of the lands of a decedent in aid of assets, upon proper application by the administrator of an insolvent estate. The court held that the Courts of Probate did possess such power; and the titles of the purchasers at such sale were held to be valid. There was in this case a dissent by Chief Justice Moses; but in neither the opinion of the court nor in the dissenting opinion is there any suggestion of doubt as to the jurisdiction of the Court of Probate in matters of partition; and Chief Justice Moses used expressions which show that he considered the Court of Probate possessed of the jurisdiction theretofore exercised by Courts of Ordinary. It is manifest that if Courts of Probate could exercise jurisdiction to sell land in aid of assets, they could in all cases, when the lands sold for more than sufficient to pay the debts, indirectly accomplish partition among the heirs.

In the subsequent case of *Hancock* v. *Caskey*, 8 *S. C.* 282, the

question was as to the ownership of the growing crop upon lands sold by the Probate Court for partition. The right thus spring-ing wholly out of one of these sales is not questioned, but, on the contrary, the court, in their opinion, speak of the sale as a valid sale, of the parties as bound by the proceedings, and that a party to the cause was estopped from asserting in his own right, or as guardian for his children, any title to the growing crops.

It thus appears that not only the profession at large, and the Probate Courts, but the Circuit Courts and the Supreme Court have all recognized and acted upon a conceded jurisdiction to Courts of Probate in matters of partition. *Communis error facit jus.* Under this conceded and recognized jurisdiction, from 1868 to 1878, thousands of acres of land have been sold in all parts of the State, a vast amount of money invested, conveyances and reconveyances made, titles and rights vested; and innocent pur-chasers, acting under this common error, shared by legislatures, lawyers and courts, have become involved. I cannot think that the decision in *Davenport* v. *Caldwell*, 10 *S. C.* 317, can affect rights thus vested; that it can have any retroactive effect. The question of jurisdiction raised at a late stage of that case in the Supreme Court, as I have been informed, required from that court an examination of the question and a decision; but I am satisfied that the decision there made cannot have any retroactive effect—cannot undo what had been done without question in a vast number of cases in the Probate Courts generally throughout the State, with the sanction of the Circuit Courts and under the recognition of the Supreme Court.

Rights vesting under such circumstances cannot be disturbed by subsequent decisions of a contrary effect. In *Gelpcke* v. *City of Dubuque*, 1 *Wall.* 175, the Supreme Court of the United States held that holders of municipal bonds issued under an act of the legislature of Iowa, sustained by the courts of that State, were valid obligations notwithstanding a later decision by the Supreme Court of Iowa, that such act of the legislature was invalid. In delivering the opinion of the court, Mr. Justice Swayne quotes with approval the doctrine in the words of *The Ohio Life and Trust Co.* v. *Debolt*, 16 *How.* 432, as follows: " The sound and true rule is, that if the contract when made was

valid by the laws of the State, as then expounded by all depart-
ments of the government, and administered in its courts of jus-
tice, its validity and obligation cannot be impaired by any subse-
quent action of legislation or decisions of its courts altering the
construction of the law." This rule is cited at length and
approved in the *Bond Debt Cases,* 12 *S. C.* 282: "To hold
otherwise would be as unjust as to hold that rights acquired
under a statute may be lost by its repeal."

In *The State, ex relatione Brown,* v. *The Chester and Lenoir
Railroad Company,* 13 *S. C.* 290, it was held that the county
commissioners of York had no power to issue certain railroad
aid bonds, but having been issued and their issue approved by
the Circuit Court, and the appeal from that decision dismissed
by the Supreme Court, that the bonds could not now be affected
by the want of authority to issue.

The same rule governs when rights of property and titles to
land have become fixed by common acceptance and consent of
courts and people. And settled rules cannot be reversed and
vested rights disturbed, by a decision of the courts against the
correctness of such construction. Such a decision only affects
the case under consideration, and establishes a new rule for the
future, but does not act retrospectively. I, therefore, think that
this sale, having been made prior to the decision in *Davenport* v.
*Caldwell,* should not be affected by that judgment.

The complaint prays that the sales be validated and confirmed,
but, as the sales were void, this prayer cannot be granted.
Nevertheless, rights may be vested under void sales, and rights
have vested under these sales, which should be protected; and
every party to the proceedings under which the sales were made
is estopped from asserting the invalidity of the sale, or question-
ing the titles of the purchasers, unless prepared to restore things
to the exact status of the day of sale. But this is just what the
infant defendants allege cannot be done, because of the inability
of their guardians to have the money forthcoming. In no case
whatever would equity allow either minors or adults to retain
the money and regain the land also. They would alike be
estopped in this attempt. The parties to this cause should,
therefore, be restrained from hereafter asserting any claim, title

or interest in or to these lands by reason of any invalidity in the sales made by the Court of Probate.

It is therefore adjudged, that the plaintiff and all the defendants to this cause, the widow and children of the late Dr. John N. Herndon, late of Union county, deceased, be and they are hereby perpetually enjoined and restrained from ever bringing any action or suit to recover the possession of the lands of the said Dr. Herndon, or any tract or tracts or portions thereof, or any interest therein derived by inheritance from the said Dr. John N. Herndon, and from ever asserting any interest therein, or to any share or portion thereof, as distributees of the said Dr. Herndon, so far as the said lands were sold or pretended to be sold under proceedings instituted in the Court of Probate for Union county, in September, 1872, and in a cause entitled *Caroline E. Herndon* v. *M. L. Moore and others.*

*Mr. David Johnson, Jr.,* for appellants.

On the point upon which the judgment of the court is rested, counsel's argument was as follows: The sales are admitted to be void. It is impossible to avoid the conclusion that this is giving to proceedings confessedly void, ending in a sale confessedly void, the essentials of a judgment, and at the same time admitting that the court of probate could render no judgment in actions for partition. In *Davenport* v. *Caldwell,* we have the first authoritative construction of the section of the constitution conferring jurisdiction upon courts of probate. This construction established no new rule, but declared what had been the law since 1868. Then, the court was without jurisdiction when this sale was made; yet the questions involved have become *res adjudicata;* minors are enjoined from asserting rights divested by a void proceeding. Further, minors represented by a guardian *ad litem,* appointed without authority, whose property has been sold and the proceeds paid over to guardians without warrant of law, are held to be estopped "unless prepared to restore things to the exact status of the day of sale."

With the most profound deference to his Honor, the Circuit judge, it must be said that these conclusions are inconsistent

with the principles declared in the authorities cited for their support, and are irreconcilable with the plainest principles of law and equity. [After commenting upon the cases cited in the Circuit decree, the argument proceeded.] With regard to the jurisdiction of the Probate Court, there had been no adjudication up to 1878. This statement of fact destroys every semblance of analogy to the cases cited in the decree. The reason of the rule not existing, the rule has no application.

But, it is said, the jurisdiction was the result of an act of the legislature, was recognized by the courts of the State, and acquiesced in by the people. Can unconstitutional acts of the legislature, and the non-action of courts *sua sponte*, have such an effect upon legal questions that they will become *res adjudicata* to all the State? The acquiescence of the people can have no more effect upon the questions here involved than the acts of the lynchers of Judy Metts upon the criminal law of the, country. The rule in *Gelpcke* v. *City of Dubuque*, rests upon solemn decisions of a court of last resort in relation to contracts. The decree here rests upon the non-action of courts and the consent of the people. In the one case, the court of last resort declared in favor of the power to contract, and the bonds were negotiated with reference to that decision. In the other case, the court of last resort declared against the power the first time its power was invoked.

If this case is to be determined by the principles of the law of contract, then the rule is as laid down in the *Bond Debt Cases*, 12 *S. C.* 277, that bonds issued by the legislature without authority are void. It does not conflict with the rule declared in *Gelpcke* v. *Dubuque*, and rests upon the same broad principle that declares the act of a court without jurisdiction of the subject matter of the action absolutely and incurably void. The rule contended for should apply with peculiar force in cases involving the rights of minors. The magnitude of the interests that may be affected, the hardships that may result indirectly from the decision, cannot affect the conclusion. It is a question of legal science which must be determined by the application of the universal principles of that science. Mr. Justice Story (2 *Sumner* 354) says: "It is not for courts of justice to provide for all the defects or mis-

chiefs of imperfect legislation." And in his *Confl. L.* 17, he says: "Arguments drawn from impolicy or inconvenience ought to have but little weight. The only sound principle is to declare *ita lex scripta est*—to follow and obey."

*Mr. R. R. Rawls*, same side.

*Mr. R. W. Shand*, contra.

January 9th, 1883. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. Dr. John N. Herndon, of Union, died intestate in March, 1872, possessed of considerable real and personal property, leaving surviving him, as distributees, his widow, Caroline E. Herndon, the plaintiff, and six children, viz., the defendants, Mrs. Mary L. Moore, Blanche Herndon, Addie Herndon, Eliza Herndon, John Herndon and Cornelia Herndon. Soon after his death (1872) the plaintiff, his widow, instituted proceedings in the Court of Probate for Union county, against the other distributees, to partition the lands of the estate, considerable in extent and value, and lying in the counties of Union, Newberry and Laurens. Blanche, Addie, Eliza, John and Cornelia, were minors, represented by guardians *ad litem*, and the proceedings in all other respects were regular and formal. The Probate judge, to effect partition, granted order of sale, and the lands were sold, those in Union for $12,866, those in Newberry for $32,859, and those in Laurens for $1,475; aggregating the sum of $47,200. The purchasers complied with the terms of sale and received titles. The purchase-money of the lands was also paid and distributed among the parties, and the business nearly ended. The lands brought full value.

Matters stood in this condition for six years, until 1878, when this court filed its judgment in the case of *Davenport v. Caldwell*, 10 *S. C.* 317, which declared that the act of the legislature, giving to the Probate Court jurisdiction to partition lands, was unconstitutional and void. In November, 1879, the plaintiff, Caroline E. Herndon (who had also been plaintiff in the proceedings before the Probate Court), fearing that some of the parties, in consequence of that decision, might make an effort to

disturb the proceedings had, as stated, in the Probate Court, instituted this action in the Court of Common Pleas, against the other distributees, to validate that proceeding in the Probate Court, and quiet the titles thereunder, and to restrain and perpetually enjoin each and all of the distributees from prosecuting any action for the recovery of the lands, or any part of them, or any interest therein under a claim by inheritance from Dr. John N. Herndon, deceased.

The adult defendants interposed no objections. The defendant Addie, a minor at the time the action was brought, has since attained her majority, and, by her answer, joins in the prayer of the complaint. The infants Eliza and Cornelia, answer by their guardian *ad litem,* David Johnson, Esq., and the infant John answers by his guardian *ad litem,* R. R. Rawls, Esq., and object to the confirmation prayed for. The clerk of the court as referee took the testimony, and reported the record of the proceedings in the Probate Court, that nearly all the purchase-money had been paid into the office of the judge of Probate according to the terms of sale, and by him paid out to the distributees respectively; that the shares of the infant distributees were paid to their guardians, duly appointed; that all the guardianship bonds were good at the time they were taken; that the bonds of the guardians of Blanche and Addie are still good; that the bond of the guardian of Eliza is not good for the amount of the penalty, and that the bonds of the guardians of John and Cornelia are worthless and not good for any amount.

The case came on to be heard before Judge Hudson, who held that the sales under the proceedings in the Probate Court, having been made prior to the decision in *Davenport* v. *Caldwell,* should not be affected by that judgment, and that all the parties " to the proceedings under which the sales were made are estopped from asserting the invalidity of the sale or questioning the titles of the purchasers, unless prepared to restore things to the exact status of the day of sale,   *   *   *   in no case whatever would equity allow either minors or adults to retain the money and regain the land also. They would alike be estopped in this attempt. The parties to the cause should therefore be restrained from hereafter asserting any claim, title or interest in

or to these lands by reason of any invalidity in the sales by the Court of Probate," &c.

From this decree the minors Eliza, Cornelia and John appeal to this court upon the following exceptions:

1. "Because his Honor decides 'That the case discloses an equity in the plaintiff which entitles her, as against her co-distributees, to a part of the relief which she demands.'

2. "Because his Honor decides 'That it would be giving retroactive effect to the decision in the cause of *Davenport* v. *Caldwell*, 10 *S. C.* 317, to refuse the perpetual injunction prayed for.'

3. "Because his Honor decides 'That every party to the proceedings under which the sales were made is estopped from asserting the invalidity of the sale or questioning the titles of the purchasers, unless prepared to restore things to the exact status of the day of sale.'

4. "Because his Honor should have decided that the plaintiff had no cause of action against the defendants.

5. "Because his Honor should have decided that inasmuch as the Court of Probate was without jurisdiction of the subject matter of the action for the partition or sale of the real estate of Dr. John N. Herndon, that said sale was a nullity so far as rights of the infants in said real estate were concerned, and that the receipt by the Court of Probate of the infants' distributive share of the proceeds of said sale, and payment thereof to the general guardian of said infants, was without authority of law, could not operate as an estoppel, and divested no rights of said infants in the real estate sold.

6. "Because his Honor decides 'That because of the common error as to the jurisdiction of the Court of Probate in actions for partition of real estate, participated in by the lawyers, legislature and the courts of the State, the rights of purchasers at said sales anterior to the decision of the Supreme Court in the case of *Davenport* v. *Caldwell* are as full, and the titles to property purchased at said sales are as perfect, as they would be if there had been no lack of jurisdiction in the court making the sale.'"

This action having been brought in the Court of Common Pleas to validate certain proceedings previously had in a court

of limited jurisdiction alleged to be void, and to enjoin all the parties, plaintiffs and defendants from claiming title or interest in certain lands sold or conveyed, under the orders of that court, in a proceeding in which the identical parties were before it, we agree with the Circuit judge that it would have been more regular if the purchasers under the order of said court, whose titles are substantially in issue, had been made parties, but as the appellants declare " a desire to have an authentic decision of the court of last resort as to the effect of a Probate Court sale in partition proceedings upon the rights of minors," we do not feel called upon to order the case back to the Circuit in order that additional parties may be made. We assume that the purchasers are desirous of retaining the lands purchased by them and proceed to consider the case.

Besides the case itself, the question involved is one not only of novel impression but of great importance, affecting as it does titles to thousands of acres of land purchased *bona fide* by innocent parties without notice, on the faith of the orders of the Probate Court, made in conformity with the express terms of an act of the legislature, the opinion of the courts and a practice well nigh universal. Under these circumstances the court ordered a re-argument of the case, and in doing so gave permission of the counsel to examine the grounds upon which the case of *Davenport* v. *Caldwell* was rested, and the extent to which the judgment as an authority must necessarily go. Exhaustive arguments have been made here upon the subject, and, in order that the law may be regarded as no longer in doubt, we will preface the judgment we are about to render by a few observations upon that case and the circumstances under which it was decided.

Under our old law the ordinary had jurisdiction to partition real estate not exceeding in value $1,000. The constitution of 1868 abolished the old Court of Equity, and made a new division of judicial powers. It created the Probate Court, giving it generally the jurisdiction of the old Court of Ordinary and also additional powers, but without expressly naming the power to partition lands even to the extent of $1,000. Upon the subject of partition, as a distinct matter of jurisdiction, it is entirely silent. The provision is in these words (Art. IV., § 20): "A

Court of Probate shall be established in each county, with juris-
diction in all matters testamentary and of administration, in
business appertaining to minors and the allotment of dower in
cases of idiocy and lunacy, and persons *non compotes mentis*," &c.

Soon after the adoption of the constitution, and to a large
extent by the persons who framed it, the legislature, in 1868,
passed an act " To define the jurisdiction and regulate the prac-
tice of Probate Courts," which, among other things, provided
that " every judge of Probate, in his county, shall have juris-
diction in all matters testamentary and. of administration, in
business appertaining to minors and lunacy and persons *non
compotes mentis*.  *  *  *  He may exercise jurisdiction of all
petitions for partition of real estate when no dispute exists in
relation to the title thereof; and when the title to such real
estate is disputed, he shall refer the same to the Circuit Court
for adjudication, unless the parties shall consent to his deter-
mination of the same," &c.   14 *Stat.* 77.

This express grant of jurisdiction contained in the act was
exercised by the different Probate Courts, and lands in all parts
of the State were without question partitioned under it until
1878, when, as stated, the judgment of this court was filed in
the case of *Davenport* v. *Caldwell, supra.*   That was a petition
in the Probate Court of Abbeville county to partition lands of
an intestate between two adults as heirs-at-law of one Caldwell.
The precise question was whether the petitioner, Katie Daven-
port, a person of color, born of slave parents before emancipation,
and who were dead before that event, was legally the sister and
heir of the intestate, and as such entitled to a share of his lands,
and, if so, she prayed partition of a tract of land of the intestate.
The judge of Probate decided that the petitioner was an heir-at-
law under the statute of distributions, and, as a consequence,
issued orders to partition the land between the widow and sister.
The Circuit Court affirmed this judgment, and upon appeal this
court also affirmed the judgment upon the point of heirship, but
denied petitioner's right to partition upon the ground that the
Probate Court had no jurisdiction to partition lands.   The court
say " the Court of Probate is unquestionably a court of inferior
and limited jurisdiction, and, looking to the constitution for the

limits of the jurisdiction of the court, we find the limits defined in section 20, article IV.; and, as there defined, cases for the partition of real estate are not embraced," and ordered that "the judgment of the Circuit Court be reversed, and the case remanded with instructions that the proceedings in the Court of Probate be dismissed, so far as they relate to partition of real estate."

It appears that there were no minors interested in the case, and the question in that aspect could not have been considered. Indeed, there seems to have been very little argument at the bar on the subject of the constitutionality of the act conferring the jurisdiction, but the question was made in the brief, and the judgment furnishes evidence that the case, at least upon some of the points involved, was fully considered by the court. The constitutional point being in the record, the court held the general proposition without qualifications that the act of the legislature, purporting to give the Probate Court jurisdiction in the partition of lands, was unauthorized by the constitution and void. There were other questions in the case which were, as stated, elaborately considered, but this one also was distinctly decided. The judgment proceeded on the ground that the section of the constitution conferring jurisdiction upon the Probate Court was exhaustive in its character, and inhibited the legislature from adding thereto.

If the question were still open, we are not prepared to say that the judgment was erroneous. There are several obvious points of difference in the circumstances of that case, and those in *Pelzer, Rodgers & Co. v. Campbell & Co.*, 15 *S. C.* 581, cited at the bar, which gives a different construction to what is called the "married woman's clause" of the constitution. Influenced by these considerations, and a strong sense of the importance of preserving uniformity and consistency in the interpretation of the laws, we will not re-open the argument involved in the case, but stand upon the principle of *stare decisis*.

It is true there were no minors interested in the case, but we see nothing in our law to sustain the view that the legislature, without regard to the limited jurisdiction given to the Probate Court, has the right as *parens patriæ*, without a case made, to authorize the judge of Probate to sell or partition the property

of one not *sui juris*. The constitution divided the functions of government into the legislative, executive and judicial, and it is the fundamental theory of our system that the departments shall be kept separate, and each in its own sphere, independent of the others. The power claimed to exist, especially when the property of the person to be sold is owned in common with others, is clearly judicial in its character, and all judicial power has been taken away from the legislature and deposited in the courts of the State, created or to be created. Besides, if such power did exist in the legislature, it is plain that the act in question was not intended to be the exercise of such power, but a general law manifestly intended to confer jurisdiction in a particular matter upon a court already in existence. *Cooley Const. Lim.* 97, 98.

It seems to us also that we cannot derive the jurisdiction from the words of the constitution in "all matters testamentary and of administration." By these words nothing more was meant, as we suppose, than matters appertaining to proceedings in an Orphans' Court, in supervising and directing executors and administrators in the discharge of their duties. This would seem to be the ordinary meaning of the words, not as conferring jurisdiction in any particular matter, but rather indicating the character of matters properly belonging to that court. Where there are no debts of an intestate, parties interested in his lands may take by partition their shares of the land itself in severalty, without sale, and we can hardly suppose that the most liberal construction of the words "matters of administration" would include such a proceeding. What are matters of administration must be determined by the laws of the State, existing at the time the language in question was introduced into the constitution. The object of administration is to pay the debts of the deceased, and distribute his personal estate among those entitled to it, and any act that may properly be performed by an administrator looking to this end, is a matter of administration. *McNamee* v. *Waterbury*, 4 *S. C.* 155.

Nor can we say that the words in the constitution granting jurisdiction to the Probate Court "in business appertaining to minors" gives to that court the right to partition land *quoad* the interest of minors. " Jurisdiction of the subject matter is a

condition precedent to the acquisition of authority over the parties, and is conferred by the authority which organizes the court and is sought for in the general nature of its powers, or in authority specially conferred." *Freem. Judg.*, § 119. It seems to us that jurisdiction of a subject matter given to a court must be an entirety, and cannot be given in part only, to be determined by the ages of the respective parties who may be interested. It is true that the words " in business appertaining to minors " seem very general and comprehensive, but taken altogether they can hardly mean more than " business peculiar to minors." Otherwise any case upon any subject in which minors happened to be interested, would be, to that extent, carried into the Probate Court, which division of cases would necessarily lead to inextricable confusion.

Assuming, then, that the decision in *Davenport* v. *Caldwell* must stand without limitation or qualification as to infants, as well as to adults, what then must be the effect of it upon the proceedings in the case of *Herndon* v. *Moore*, which had been instituted in the Probate Court and nearly ended long before that judgment was filed? Does it follow that the innocent purchasers at the sale ordered by the Probate Court in the Herndon case, who purchased in good faith and paid for lands sold under proceedings expressly authorized by a law standing upon the statute book, must be required to yield up their lands to be again partitioned? We cannot accept a conclusion which would open up such a prolific source of litigation and result in such flagrant injustice.

In the first place there can be no doubt that all persons of full age, who were parties to the proceedings of *Herndon* v. *Moore* in the Probate Court, are estopped from denying the validity of those proceedings. When land descends to heirs upon the death of an intestate, they become the legal owners as coparceners and may enjoy it in common, or divide it among themselves, or they may go into the courts provided by law for that purpose. When they choose to do the latter, they select the court and its officers as the instrumentality through which to effect partition, and they are bound by the acts of that court, as in one sense their agent. *Commissioner* v. *Thomson*, 4 *McC.* 434. Whether that court had constitutional jurisdiction or not, they consented to its pro-

ceedings. They held it out as authorized to act in the matter for them, they did not appeal from its order of sale, and they are estopped from claiming against their own sales made in this way for the purpose of partition. "If lands be sold at a partition or other Chancery sale, no co-tenant who has claimed and received his share of the proceeds, can deny the validity of the partition." *Freeman Void J. S.* § 48 ; *Story Eq. Jur.* 387 ; *McNish* v. *Guerard*, 4 *Strob. Eq.* 76.

So far as the adult parties are concerned there can be no doubt that the purchasers are entitled to hold the land. It may be true that in this view they do not get title. It is not the office of an estoppel to pass the title, which remains unaffected, but it cannot be asserted against the party who acted upon the faith of the representations which created the estoppel. *Big. Estop.* 450.

It is, however, strongly urged upon us that the result must be different as to the minors, Eliza, Cornelia and John, who, being under the disability of infancy, could do no act, either in going into the Probate Court or in confirming the sales afterwards.

Estoppel *in pais* ordinarily is based upon the conduct of parties, and as minors are incapable of responsible action, it would seem to follow that as a general rule the doctrine of technical estoppel has no application to them. This rule, however, is not without exceptions. Minors, of age of discretion, are certainly liable *ex delicto* for fraudulent misrepresentations as to title, and in such case, to prevent circuity of action, the court will in the first instance charge the land in favor of the purchaser with the amount of the purchase-money. *Big. Estop.* 448. It is, however, unnecessary to pursue this view, as it is not claimed that any such representations were made by the minors in this case.

But a higher right is invoked in behalf of the purchasers, which, under the circumstances of the case, we think they are entitled to. This does not rest upon any theory of confirmation by the parties, but upon the fact that the purchasers bought *bona fide* at a sale judicial in form, at the time believed to be valid, and paid the purchase-money for the land thus purchased. It is urged that the sale for partition by the Probate Court in the case of Herndon, having been made prior to the decision in

*Davenport* v. *Caldwell,* and while the jurisdiction of the Probate Court was generally recognized, should not be affected by that judgment. Certainly the judgment in that case only bound the parties before the court, but a decision of the Supreme Court upon a constitutional question, not only affects the case before the court, but stands as an authoritative construction of the clause interpreted, and, as a general rule, is conclusive upon other cases involving the same question.

This is certainly true of all cases arising after the decision. And although in its effect upon cases decided before, there may be something of the element which makes *ex post facto* laws so objectionable, yet there is undoubtedly a difference in effect between repealing a valid law, and declaring that one in form never was law. In the former case all acts done and rights vested under the law before its repeal, will be maintained, while in the latter the declaration of its unconstitutionality ordinarily reaches back to the date of the act itself. But there is an exception as to a class of cases in which, for sufficient reasons, the declaration of the unconstitutionality of a law is not allowed to have greater effect than a simple repeal sustaining all acts done and all judicial proceedings had under it before such declaration, in analogy to the principle of *res adjudicata.*

In such case, rights acquired under an act having the form of law, are sustained, although the act be afterwards declared unconstitutional upon the principle involved in the maxim *communis error facit jus.* This proceeds upon the view that to annul everything done under an act solemnly passed by the law-making power of the State, generally received as valid and so expounded and administered by courts of justice, would operate as a fraud upon the parties thus misled. This doctrine, although exceptional in character, is well sustained by authority. Mr. Wharton, in his law of evidence, section 1242, says : " It should also be kept in mind that there are cases in which *communis error facit jus,* and in which therefore the courts will sanction a prevalent construction which is erroneous, rather than disturb titles which have been settled under such construction."

Perhaps the leading case upon the subject in this country is that of *Gelpcke* v. *City of Dubuque,* 1 *Wall.* 175. It appears in

that case that the legislature of Iowa passed a law authorizing the city of Dubuque to aid in the construction of a certain railroad by issuing bonds in pursuance of a vote of the citizens of the city. The Supreme Court of the State decided that the legislature had the right to authorize municipal corporations to subscribe to railroads extending beyond the limits of the city or county, and to issue bonds accordingly. During the time the law was thus expounded, bonds were issued upon the faith of it. Afterwards, the Supreme Court of the State decided that the legislature had no such power. It was held by the Supreme Court of the United States that the latest decision, declaring the act unconstitutional, did not affect rights which had been acquired before its rendition, thus giving the judgment the effect only of the repeal of a valid law. In delivering the judgment of the court, Mr. Justice Swayne said : " However we may regard the late case in Iowa as affecting the future, it can have no effect upon the past. The sound and true rule is that if the contract, when made, was valid by the law of the State, as then expounded by all departments of the government, and administered in the courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the State, or decisions of its courts altering the construction of the law. *Ohio Life and Trust Co.* v. *Debolt*, 16 *How.* 432."

The same principle applies where there is a change of judicial decisions as to the constitutional power of the legislature to enact the law. It rests upon the plainest principles of justice. " To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal." This principle has been incidentally recognized in our State in the *Bond Debt Cases*, 12 *S. C.* 282, and also in the case, *State, ex rel. Brown*, v. *C. and L. R. R. Co.*, 13 *S. C.* 291. In the *Bond Debt Cases*, Mr. Justice McIver, in delivering the judgment of the court, said : " This rule was again affirmed in the case of *Lee Co.* v. *Rodgers*, 7 *Wall.* 181, and the question was there said not to be open for re-examination in the Supreme Court of the United States. It is perfectly manifest, therefore, that even were we to overrule the case of *Morton, Bliss & Co.* v. *The Comptroller-General*, it would not help the case of the State, in view of the rule thus

firmly established (whether correctly or not we are not called upon to say) in the tribunal of last resort."

In England they have no written instrument which embodies in form the fundamental law, but the doctrine has always been recognized there, especially in reference to conveyances of real estate. In *Broom Max.* 141, under the head of *communis error facit jus,* it is said: "The law so favors the public good that it will in some cases permit a common error to pass for right, as an instance of which may be mentioned the case of common recoveries, which were fictitious proceedings introduced by a kind of *pia fraus* to elude the statute *de donis,* and which were yet allowed by the courts to be a bar to an estate tail, so that these recoveries, however clandestinely introduced, became by long usage and acquiescence a most common assurance of lands, and were looked upon as the legal mode of conveyance, whereby tenant in tail might dispose of lands and tenements."

In *Jones* v. *Tapling,* 12 *Com. B.* (N. S.) 846, Mr. Justice Blackburn said: "There are cases in which a decision originally erroneously has been so long acquiesced in and acted on, that a return to the proper principle would greatly affect existing interests. This is peculiarly the case in questions of conveyancing lands. There the maxim applies, *communis error facit jus.*"

In *Regina* v. *Sussex,* 2 *Best & S.* 680, the same judge said: "I think there are cases in which a mistaken notion of the law has, no matter why, become so generally accepted by and acted upon as to render it probable that business has been regulated, and the position of the parties altered in consequence; and in such cases we may hold that the general acceptation of the mistake has made that law which was originally error."

In the case of *Isherwood* v. *Olknow,* 3 *M. & S.* 396, (54 *Geo. III.,*) Lord Ellenborough said: "It has sometimes been said *communis error facit jus,* but I say *communis opinio* is evidence of what the law is, not where it is an opinion merely speculative and theoretical floating in the minds of persons, but where it has been the groundwork and substratum of practice."

In the great case in the House of Lords of *Phipps* v. *Ackers,* 9 *Cl. & F.* 598, Lord Brougham said: "The courts and even this house have frequently proceeded upon this principle, and

have sanctioned what even plainly appeared to be erroneous principles introduced and long assumed as law, rather than occasion the great inconvenience that must arise from correcting the common error and recurring to more accurate views."

All the cases which admit the principle at the same time declare that it is exceptional and should be applied with the greatest care. Do the facts of this case fairly bring it within the rule as announced by Lord Ellenborough, that it is not enough that the erroneous opinion be merely speculative and floating in the mind, but must furnish "the groundwork and substratum of practice." We cannot resist the conclusion that the facts here make such a case. The partition sale ordered was in no sense tortious, and it would operate as a fraud upon innocent parties to vacate the titles acquired under proceedings in the Probate Court, established by authority of the State, and the parties thereby invited to use it for the purpose of partition. The legislature at its first session after the adoption of the constitution, on September 21st, 1868, passed "An act to define the jurisdiction and regulate the practice of the Probate Court," by which jurisdiction was expressly given to that court to partition lands. This might well be considered as a contemporaneous construction of the constitution. This act was re-affirmed in the code of 1870, and re-enacted again in the general statutes in 1872.

For more than ten years, until November, 1878, when *Davenport* v. *Caldwell* was decided, it was generally accepted as the undoubted law of the State. The jurisdiction was exercised without challenge, and a great number of cases were instituted in that court and thousands of acres of land sold in all parts of the State. As Judge Hudson says: "Lawyers in all parts of the State acted under it, Courts of Probate exercised this jurisdiction unchallenged, and the Circuit Courts recognized it and adjudged questions arising from such proceedings." The truth is that all parties acted in good faith and were misled. According to our view, the proceedings for partition of Herndon's estate, regularly had in the Probate Court, prior to the decision of *Davenport* v. *Caldwell*, should be held binding upon all the parties concerned.

The judgment of this court is that the judgment of the Circuit Court be affirmed.

Chief Justice SIMPSON and Associate Justice McIVER concurred in the result.